MARGARET NEW *et al.*, plaintiffs in error, *vs.* SAMUEL POTTS, executor, defendant in error.

1. A power of appointment annexed to an estate for life, is not abridged or withdrawn by a subsequent direction in the same will that, in case the tenant for life, who is the donee of the power, shall marry, she and her husband shall give bond and security for the forthcoming and delivery of the property, at the termination of the life estate, "to be disposed of as before mentioned," there being no disposition before mentioned, other than that which the tenant for life was authorized to make by exercising the power.

2. Neither the marriage of the tenant for life, nor failure to give the bond and security after marriage, cut down or curtail the power; more especially, as there was, in fact, no loss by waste or removal of the property during the coverture.

3. Disposition by last will is a disposition at death, no matter how long before death the will may have been executed. It need not be executed in *articulo mortis,* nor in the last sickness.

4. A power of disposition in the testator's widow, wholly unlimited as to beneficiaries, may be exercised in favor of her second husband.

5. That the exercise of a limited power in respect to one-half of the property was illusory or collusive, would not make void the exercise of an unlimited power as to the other half, it not appearing that the latter power would have been differently exercised if the former had not been perverted.

6. What is a perversion of power is a question of law for the court; but whether the evidence establishes a perversion, under all the circumstances of the case, is a question of fact for the jury.

7. If the fruits of a power be sold and conveyed by the beneficiaries, in advance of the time for enjoyment, and the price received be a full and fair equivalent for the actual fruits, under a faithful and legal exercise of the power, the beneficiaries who have thus parted with their interest, with knowledge of all their rights, are not injured by any abuse of the power, and a court of equity will not correct the abuse at their instance.

8. A fair sale, at full price, by legatees of full age, to the executor or his agent, or to one purchasing at his instance, under an arrangement to convey to him, will not be set aside at the mere election of the legatees, after

New *et al. vs.* Potts.

years of acquiescence by them; and in view of the facts of the present case, it was not error to instruct the jury that the sale was *prima facie* valid, and that the *onus* of showing the contrary was upon the legatees.

Powers. Wills. Administrators and executors. Legacy. Sale. Before Judge HOPKINS. DeKalb Superior Court. March Term, 1875.

Reported in the opinion.

M. A. BELL; W. H. HULSEY, for plaintiffs in error.

L. J. WINN; M. A. CANDLER, for defendant.

BLECKLEY, Judge.

Potts, the defendant, was a double executor, being first, executor jointly with Mrs. Wootten, of her husband's will, and secondly, sole executor of her will, she having married him after the death of Wootten, her first husband. Wootten, the testator, died in 1855; his widow, afterwards Mrs. Potts, the testatrix, died in 1867. She made her will in 1859, after her intermarriage with Potts, and to him she bequeathed, besides a specific legacy, one-half of the general property which came to her under her former husband's will. The other half she bequeathed to the nine children of Mrs. Bishop, Wootten's deceased sister, giving to three of them $5 00 each, to four of them $300 00 each; to one of them $400 00, and to one of them the residue of that half. In all this property she had an estate for life, with power of disposition at her death. The will of Wootten, under which she took both the property and the power, expressly authorized her to dispose *at* her death, of one-half according to her own will and pleasure; but the other half she was to give, devise and bequeath to the children of Mrs. Bishop, the testator's deceased sister, in any way she might see proper, not being bound to make an equal division among them, but being allowed to use her own will and pleasure in the apportionment. A subsequent provision of the will directed that in case she should marry, she and her hus-

band were to give bond and security for the forthcoming and delivery of all the property belonging to the testator's estate at the time of such marriage, to be delivered up at her death, "to be disposed of as before mentioned."

After her intermarriage with Potts, which took place in 1858, demand was made upon them by some of the Bishop children to comply with this requisition of the will, and they refused to do so. Between this marriage and the execution of Mrs. Pott's will, Potts authorized one Crockett to buy up for him the shares of the Bishop children, provided he could get them all, and at not exceeding $300 00 a share. Prior to the execution of the will, Crockett bought, at that price, two of the shares, and subsequently, at the same price, five more; the latter being the three $5 00 shares and two of the $300 00 shares; and the former being one of the $300 00 shares and the residuary share. The earliest purchase was in January, 1859, and the latest in January, 1860. The price, in each case, was paid in cash at the date of purchase; and the owners of the shares conveyed the same to Crockett by deed in due form. The $400 00 share and one of the $300 00 shares Crockett could not obtain, as the owners refused to sell. In February, 1861, Crockett conveyed to Potts by deed the seven shares to which he had procured title, Potts paying for them at the rate of $320 00 each, besides interest on their cost to Crockett. Thus, at the death of Mrs. Potts, in 1867, Potts came in as legatee under her will for one-half of the Wootten property, and as purchaser, for seven of the nine shares in the other half, three of these shares being for $5 00 each, three of them for $300 00 each, and one of them being all the residue of the half except the $400 00 share and the $300 00 share not bought in. The seven purchased shares cost Potts $2,240 00, besides the interest which he paid to Crockett, and the further interest on his outlay up to the death of his wife, the tenant for life; and the owners of these seven shares realized for them in cash, $2,100 00, and the interest on that sum for over seven years, on a part of it for eight years. Early after the death of Mrs. Potts, Potts, as her executor,

paid the owners of the two outstanding shares, to one $400 00 and to the other $300 00, taking their receipts in full.

The value of Wootten's estate in 1855, according to the inventory and appraisement provided for by law, was $14,000; of which sum a little more than $4,000 00 was in slaves. The lands were appraised at $4,000 00. In 1867, after the death of Mrs. Potts, the tenant for life, the same lands were appraised at $2,300 00; and the whole estate on hand at $2,670 00. Mrs. Potts, at the death of Wootten her first husband, was fifty, and at her own death, about sixty-two years of age. At the time the Bishop children sold out they were all of full age, and had families of their own. The inventory and appraisement of Wootten's estate were on record in the ordinary's office, and, so far as appears, there had been no default on the part of the executors in making annual returns.

Potts was discharged from his executorship of one or both of the estates, certainly from that of the estate of Wootten, before the present bill was brought. The bill was brought in 1871 by the Bishop children and their representatives, and the object of the original, with its various amendments, was to get rid of the sales made to Potts through Crockett, and to compel Potts to account for the whole of Wootten's estate.

1. The theory of the bill as to one-half of the estate is, that Wootten, leaving no children, and the Bishop children being his next of kin, the latter were his heirs-at-law, and consequently took this half by the statute of descent. To reach this result it is necessary not only to set aside Mrs. Wootten, herself, as the heir-at-law, but to make void the bequest to Potts, her second husband, made by her in the exercise of the power conferred by her first husband's will. To do this, it is said that the provision in that will requiring bond and security to be given in case of her marriage, for the forthcoming and delivery of all the property, at her death, "to be disposed of as hereinbefore mentioned," was a virtual abrogation of the power which, in a preceding part of the will, had been delegated to her in respect to that half of the

New *et al. vs.* Potts.

estate.   In other words, it is·urged that the scheme of the will was, for her to have this power if she did not marry, but not to have it if she did marry.   There is no trace of such a discrimination, that we can see, in the will itself.   The forthcoming and delivery intended to be secured were for a purpose, to-wit: that the property might be disposed of, not according to the statute of distributions, but according to the will; and the will provided for no disposition otherwise than by the exercise of this very power.   The requisition as to bond and security, so far from being intended to antagonize the power, was designed alone to aid it and prevent its exercise from being empty and ineffectual.   The testator trusted his widow to carry the power with her into a second coverture and there to exercise it, but being apprehensive that the custody of the property itself might be less safe after her marriage than before, he called for bond and security so that her will, whatever it might be, should be carried out.   He designed to protect the power, not to destroy it.

2. The power was not lost by the widow's marriage; nor was it lost by refusal to give the bond and security which the will required.   What would have been the effect of this refusal if there had been a waste or removal of the property to the injury of any person other than the second husband himself, it is wholly unnecessary to consider.   The facts of the case do not call for research in that direction.

3. A point is presented in argument that the disposition authorized was a disposition by the widow to be made *at her death,* and it is insisted that she made none then because her will was executed in 1859, and she died not till 1867.   It would be a fanciful misconstruction to hold that a power like the one in question had to be exercised literally *at death*—in the moment of dissolution.   It is sufficient that the act, whenever done, takes effect at death; and that is the case with every last will and testament.   Until death the will is of no force; all powers which it serves to execute remain unexecuted till life is extinct.

4. The power of disposition in this case was wholly unre-

New *et al. vs.* Potts.

stricted as to one-half of the estate. It was therefore competent for the donee of the power to exercise it in favor of her second husband. She had all the world to choose from, and there was nothing contrary to law or contrary to any other principle of rectitude in confining her bounty to her own household. As she had no children she but followed the usual path of affection in preferring her husband to all others.

5. Nor would this legacy to her husband fail, however illusory or however collusive or defective may have been the execution of the limited power in reference to the other half of the estate. There is no indication in the record that the complainants, or any of them, were ever thought of by Mrs. Potts in any testamentary scheme touching the half which she had a right to dispose of at her own will and pleasure; nor is there the least reason for inferring that Potts would have been excluded from that half or any part of it if the other half had been dealt out otherwise than as it was. All the indications are that, however smaller prizes might have been varied, he was absolutely sure of the capital.

6. What has been said overrules substantially all the positions of complainants' counsel, so far as that half of the estate is concerned which was subject to the unlimited power of appointment. The other half, in respect to which the power was limited, may not have been disposed of with that approach to equality which the donee of the power, notwithstanding the broad discretion with which she was invested, ought to have observed. It is complained that, as to some of the beneficiaries, the exercise of the power was illusory, and, as to all of them, that it was collusive. The court below, on both these heads, instructed the jury very fully, and very favorably to the complainants. The law was laid down so satisfactorily that even the complainants' counsel have not questioned it. It was for the jury to say, under all the facts and circumstances of the case, whether a perversion of the power was made out or not; and even if made out, they were not obliged to find for the complainants, for such of the latter as had not received and accepted the fruits of the power since

the death of the tenant for life, had long previously sold and conveyed, for a valuable consideration, all their interest.

7. The two complainants who did not part with their interest certainly received a liberal proportion of the estate; and the others, by anticipating the fruits of the power through a sale in advance of the death of the life-tenant, severed themselves from the *actual* fruits, whatever they might be. They ceased, by their own voluntary act, to be interested in the exercise of the power, and its abuse did them no harm. Two of them sold before Mrs. Potts made her will. Having done this, it was surely no concern to them what the will might be, or what it afterwards actually was. Those who sold after the will was made, either knew of its provisions or they did not; if they knew, they deliberately elected to take a sum of ready money in lieu of its provisions; and if they did not know, their action without such knowledge was still free and voluntary. If any of them intended to stand upon their legal rights in respect to an exercise of the power, they ought not to have sold out. There is no proof that they were ignorant of their rights, or if ignorant, that they used any diligence to be informed. The bill charges that the inventory of Wootten's estate was not full as to the money on hand at his death, but the charge was not sustained by the evidence; and we treat the case as a fair and open one in respect to the extent, value and condition of Wootten's estate. Considering the appraised value of the estate, the age of the tenant for life, and her wide discretion in apportioning the property among the nine Bishop children, we think that the jury may well have considered that $300 00 for any one share was, in 1859, or in 1860, a full and fair price. In the very nature of the transaction, each sale was, to some extent, the sale of a chance merely, for as long as Mrs. Potts lived any given share was subject, within certain limits, to be increased or diminished at her pleasure. Besides, a considerable part of the estate was in personalty, and much of this was lost in fact by emancipation of the slaves.

8. That the shares were purchased in for, and ultimately

by, the executor, we think should make no difference under the facts of the present case.   He paid, as we have just said, what may be regarded as full value; and the legatees were of full age, had knowledge of their rights, acted freely and voluntarily, and acquiesced in his purchase for many years before themselves repudiating the contract and tendering back the money.   After such a lapse of time, the *onus* of proving fraud, if there was any, should be upon them.

The charges of the bill do indeed make a diabolical case. According to them, Potts was a most mercenary and seductive rascal; his wife's marriage was a fraud; her last will and testament was a fraud—only her death was fair.   If, in very truth, there was such a scheme of wickedness, it is gratifying to find that it was mercifully overruled, so that it did no real harm to these complainants.

It cannot be denied that Potts started out as executor and came in at last as owner, having succeeded the testator even in the office of husband.   But why may not a Potts marry for love? and once married, it was no uncommon lot for him to become the favorite of his wife, and therefore her legatee. Half his good fortune is thus accounted for; and the other half was the result of purchase, at what seems to have been a fair price.   The jury were satisfied not to molest him, and so are we.

Let the judgment stand affirmed.