ALEXANDRA E. MOORE, LELA EMERY MARQUISE DE TALLEYRAND, AND AUDREY PRINCESS ANNA ILYINSKY

*vs.*

THOMAS EMERY, JOHN J. EMERY, JR., AND GIRARD TRUST COMPANY.

Hancock.        Opinion, March 12, 1941.

*David O. Rodick of* ·
' *Deasy, Lynam, Rodick & Rodick,* for complainants.
*Maurice Bower Saul and Raymond M. Remick of*
    *Saul, Ewing, Remick & Saul*
*Frank W. Gray,* for respondents.
*Harold H. Murchie,* for the Guardian *ad litem.*

SITTING: BARNES, C. J., STURGIS, THAXTER, HUDSON, MANSER, WORSTER, JJ.

THAXTER, J. This case is before us on report. Alexandra E. Moore, Lela Emery Marquise de Talleyrand, and Audrey Princess Anna Ilyinsky now known as Princess Dimitri Djordjadze, three of the children of John J. Emery, late of Bar Harbor, bring a bill in equity asking for a construction of certain clauses of his will. Coupled with the prayer for construction is one that the Girard Trust Company, the trustee under the will and a defendant in this action, be instructed as to the proper disposition of cash received from the sale of stock warrants and rights and as to the status of certain stock dividends including fractional shares and script received by it as trustee. The defendants named in the bill are two sons of the testator, and the Girard Trust Company. A guardian *ad litem* was appointed to represent and act for the minor children of the children of the testator and all issue not in being of the children of the testator. The defendants named in the bill and the guardian

*ad litem* filed answers, and joined in the prayer of the bill for construction of the will and for instructions to the trustee.

A review of the facts is necessary for a solution of the issues properly presented by the pleadings.

John J. Emery died September 5, 1908, leaving a large estate. His will was admitted to probate in Hancock County November 4, 1908. His widow, Lela A. Emery, waived the provisions of the will in her favor and elected to take by descent in accordance with the provisions of R. S. 1903, Chap. 77, Sec. 13. She is therefore not concerned with the present litigation. At the age of eighteen she had married Mr. Emery who was then fifty-eight. In 1902, possessed of a very large estate, he drew his own will and died six years later at the age of seventy-three, leaving two sons and three daughters, the youngest of whom, Audrey, was born two years after the execution of the will. The testator was not a lawyer and his attempt to draft a very complicated will to give effect to certain dispositions of his property which he did want and to prevent its passing in certain ways which he did not want has posed for his children many problems, some immediate, some remote or contingent, but all of which they have bundled up with more or less despair and present to this court for solution.

Under the provisions of the will, Thomas J. Emery his brother, was appointed executor, and the Girard Trust Company was named trustee. He gave to his widow the use of certain real estate and personal property so long as she should remain his widow, and, after providing for a number of bequests not of importance in this proceeding, gave the balance of the estate to the trustee. One third of the income remaining in the hands of the trustee with the exception of income on accumulations was to be paid to the widow until the time when what was called in the twenty-third clause of the will the "final distribution" of the estate should be made. As the widow waived the provisions of the will for her benefit, they are not of importance except in so far as they may throw light on the general purposes which the testator had in mind.

He then directed in clauses nine and ten that on any son reaching the age of twenty-one years the trustee should set apart for him the sum of $50,000.00 in trust and should pay the income to him. He then in clauses eleven and twelve made a similar provision for each of

his daughters. In clause thirteen he provided that on a son reaching the age of thirty years, or if he should marry at an earlier age with the consent of his mother or guardian, an advancement was to be made to him of $150,000.00. A similar provision in clause fourteen was made for each daughter; but instead of her share being paid outright it was to be held in trust during her life and she was to receive only the income. By the provisions of clause sixteen whenever a son should reach thirty-five years of age a further advancement was to be made to him of $150,000.00. A similar provision by clause seventeen was made for each daughter; but as in the case of the first advancement her share was to be held in trust. The eighteenth clause of the will provides for the termination of the above special trusts for the daughters. It reads as follows:

"The special trusts created in clauses 11th, 12th, 14th and 17th of this will shall terminate at the death of each daughter. Each daughter is hereby given the power to dispose of by will the principal of the trusts created in her favor, provided it be bequeathed to my descendants. At the death of each daughter of mine, I direct my Trustee to pay or transfer so much of my estate as may be held in special trust for the said daughter, to the executor or executors of the will of said daughter to be disposed of as provided in such will to my descendant or descendants. If a daughter of mine die intestate leaving issue, I direct my Trustee to pay the principal of her special trusts to her legal representative. If any of my daughters die intestate and without issue, the special trusts created in her favor shall revert to my estate."

The next clause of the will is significant as showing the fear which the testator had that a daughter's husband might obtain control of the money paid to her. It directs that payments by the trustee shall be made so far as possible by direct communication with the daughters and "free from the control of any husband."

Clause twenty provides that until the "final distribution" so called any surplus income of the principal trust as distinguished from the special trusts above mentioned shall be added to the principal as accumulations. But there is a proviso that in case of misfortune suffered by any child advancements could be made by the

trustee to such child or to his or her children from this accumulated income, such advancements to be charged against the share of such child in final distribution.

By the provisions of clause twenty-five the trust fund of $50,000.00 set up for each son when he should reach the age of twenty-one years was to be paid to each when he should reach the age of thirty-nine years. When this has been done it should be noted that each son will have received outright $350,000.00 and similarly each daughter, when she shall have arrived at the age of thirty-five years, will have received a like amount to be held for her in trust during her life, she to have the right to dispose of the principal by will as provided in the eighteenth clause of the will.

By clauses twenty-three and twenty-four the will provides for what the testator calls "the final distribution of my estate." What is the principal trust, being the balance of the estate in the hands of the trustee is to be disposed of in the following manner. When the youngest surviving son arrives at the age of forty years, the trustee is directed to appraise the estate, to add thereto the sum of any advancements made to any children or their issue, including therein all payments made to the sons, and the value of the special trusts set up for the daughters, "and then to divide the sum total produced by this addition into as many equal parts as I may leave children living at the time of the arrival of my youngest son at the age of forty years and including as representing one equal part the issue of any child who may have deceased, and also one equal part to my widow, if she be then living, and thereupon to pay and transfer to each of my sons one of the said equal parts, or so much property as will equal one of the said equal parts, deducting from each share so paid or transferred, the sum of the advancements made to him. One equal share shall be allotted to my widow and one equal share shall be allotted to each daughter and one equal share shall be allotted to the issue of any deceased child of mine, after deducting from the share of each the sum of all advancements and of special trusts for her benefit to each daughter or to the issue of any child who may have deceased. Upon such distribution of my estate all rights of my widow under clause 7th of this will shall cease and determine, but the right to use and occupy my residences as provided shall continue until her death or remarriage."

The twenty-fourth clause of the will, which provides for the termination of the trusts set up in the twenty-third clause reads as follows:

"I hereby direct that the shares in this division allotted to my widow and to my daughters shall be held by my Trustee for them during their lives for their benefit, the income to be paid to each and at the death of each the principal shall pass to my descendants only, and in the manner, in equal or unequal shares, and at the time prescribed in the wills of each one. In the event of my widow or daughter or daughters dying intestate, the share of each so dying shall be distributed among my descendants only, and equally according to the statutes then in force."

It is perhaps well to call attention to the twenty-sixth clause of the will which expresses the intention of the testator to treat all of his children exactly alike, except of course with respect to the control by the daughters over the principal of their shares. The twenty-eighth clause of the will also makes plain the testator's purpose that the issue of a deceased child is to succeed to the rights of the parent.

The real problems which the parties desire solved, in so far as the construction of the will is concerned, arise primarily over the meaning of the eighteenth clause of the will which provides for the disposition of the special trusts set up for the daughters and over the twenty-fourth clause which provides for the disposition of the trusts set apart for them under the twenty-third clause. As has been pointed out, we are not concerned with the widow's share as she waived the provisions of the will.

In 1921 a bill in equity was brought in the Supreme Judicial Court in Hancock County seeking a construction of clause twenty which provides for the accumulation of income and to determine if the provisions of clause twenty-three relating to the termination of the main trust were illegal. An agreement was reached between all the parties and a decree was entered April 14, 1923, providing that all future income from this so-called main or principal trust should be distributed quarterly until the final distribution of the estate should take place as provided in the twenty-third and twenty-fourth

clauses of the will. The decree also provided that all the income which prior to that date had been accumulated should be held in separate trusts to be known as "Accumulation Trusts," and that the income from each should be paid to each of the respective beneficiaries quarterly until the death of a beneficiary or until January 28, 1938, whichever event should first occur, the date fixed being the time when the youngest son would reach the age of forty years, the date set in the will for the so-called final distribution. The principal of each accumulation trust was then to be paid over to each beneficiary outright and free of all trusts excepting that as to the daughters there was to be deducted an amount sufficient to set up the special trusts, the final payment to establish the trust for the youngest daughter being due January 4, 1939, when she would reach the age of thirty-five.

This summary indicates the problems created by the terms of the will. But that is not all. The plaintiffs allege on information and belief that the trustee of the main and special trusts has received in cash from the sale of rights to subscribe and warrants approximately $120,000.00 and that there is a doubt whether this money is principal or income within the meaning of the will. Also it is alleged that there are in the inventory of the main trust stock dividends, including fractional shares and script, some of which were declared out of current earnings and some as a redistribution of capital, and that a controversy has arisen as to whether these are principal or income. The bill prays for a determination of these questions. The Girard Trust Company in its answer admits these allegations of the bill and joins in the prayer.

The bill in equity was filed November 7, 1938, and was amended July 26, 1939. A hearing was had March 28, 1940, at which time the cause was reported to this court. The bill shows that all of the children of the testator have survived and the time for the so-called final distribution has arrived. At the time of the hearing we discover from the testimony of Mr. Grimes, the assistant trust officer of the Girard Trust Company, that the situation with respect to the estate was substantially as follows:

Including the special trusts, the accumulation trusts set up under the decree of April 14, 1923, and the trusts provided for in the so-called final distribution, the Girard Trust Company was trustee of

sixteen separate trust funds totalling $13,190,189.39. Mr. Grimes' figures do not exactly check but this is substantially the correct amount. These would be apportioned among the children of the testator as follows:

*For Thomas:*

| | |
|---|---|
| 1. One-fifth part of the general trust | $1,275,036.02 |
| 2. Accumulation Trust | 1,072,220.72 |
| 3. One-fifth of fund representing proceeds of corporate distributions where apportionment between principal and income is in doubt, approximately | 24,000.00 |
| | $2,371,256.74 |

*For John J., Jr.* the amount would be as follows:

| | |
|---|---|
| 1. One-fifth part of the general trust | $1,275,036.02 |
| 2. Accumulation Trust | 1,396,362.00 |
| 3. One-fifth of fund representing proceeds of corporate distributions where apportionment between principal and income is in doubt, approximately | 24,000.00 |
| | $2,695,398.02 |

*For Alexandra* the set-up would be as follows:

| | |
|---|---|
| 1. One-fifth part of the general trust | $1,275,036.02 |
| 2. Accumulation Trust | 1,120,929.43 |
| 3. One-fifth of fund representing proceeds of corporate distributions where apportionment between principal and income is in doubt, approximately | 24,000.00 |
| 4. Special trusts under clauses 11, 14 and 17 of the will | 350,000.00 |
| | $2,769,965.45 |

*For Lela* the amounts would be as follows :

| | |
|---|---|
| 1. One-fifth part of the general trust | $1,275,036.02 |
| 2. Accumulation Trust | 1,001,785.44 |
| 3. One-fifth of fund representing proceeds of corporate distributions where apportionment between principal and income is in doubt, approximately | 24,000.00 |
| 4. Special trusts under clauses 11, 14 and 17 of the will | 350,000.00 |
| | $2,650,821.46 |

*For Audrey* it would be :

| | |
|---|---|
| 1. One-fifth part of the general trust | $1,275,036.02 |
| 2. Accumulation Trust | 1,053,711.70 |
| 3. One-fifth of fund representing proceeds of corporate distributions where apportionment between principal and income is in doubt, approximately | 24,000.00 |
| 4. Special trusts under clauses 12, 14 and 17 of the will | 350,000.00 |
| | $2,702,747.72 |

As the two sons are entitled to their shares outright, it makes no difference to them whether the amounts approximating $24,000.00 in the share of each represent income or principal. Depending on the construction placed on the powers of appointment given to the daughters under the eighteenth and twenty-fourth clauses of the will, the sons may have an interest in the proper allocation of these amounts set off for the daughters. The really important question in the case, however, concerns the ultimate disposition of the special trusts set up for the daughters under the eleventh, twelfth, fourteenth and seventeenth clauses of the will and of the general trusts set up for them under the twenty-third clause. The eighteenth clause provides for the disposal of the principal of the special trusts, the twenty-fourth clause for the disposal of the principal of the general trusts.

Before considering the many problems raised by these provisions of the will, let us consider that part of the bill which seeks instructions for the trustee relative to the status of stock dividends of corporations, including fractional shares and script, and of the cash received from the sales of warrants and rights to subscribe.

Equity as a necessary adjunct to its control over trusts has for a long time assumed jurisdiction to instruct or direct a fiduciary, whether an executor or a trustee, as to his duties in the administration of the estate committed to his care. The directions are given where the fiduciary is in doubt as to the proper performance of his duties because it is recognized that he should not in such cases be required to act at his peril. In cases of trusts such power was expressly given to courts of equity in this state prior to the enactment of the P. L. 1874, Chap. 175, conferring general equity powers. See R. S. 1871, Chap. 77, Sec. 5. The essential part of this provision relating to the grant of powers now reads as follows, R. S. 1930, Chap. 91, Sec. 36, X : "To determine . . . in cases of doubt, the mode of executing a trust. . . ." It was a right primarily given to the fiduciary for his protection and there are authorities which hold that the bill can be brought only by the fiduciary. *McAllister* v. *Elliott*, 83 N. H., 226, 140 A., 708, 65 C. J., 682. In the bill now before us, the request for instructions is made not by the fiduciary but by certain beneficiaries who combine a prayer for construction of the will with one for instructions to the trustee based in no sense on any ambiguity in the will but on doubts as to the status of certain assets received by the trustee since the trusts were established. The procedure is unusual. If all requisite facts were before us, it may be that in view of the answer of the trustee this court would give the instructions. But we do not decide this procedural question; for on other grounds we must decline to answer.

The plaintiffs in their bill allege on information and belief that the trustee has received over $120,000.00 from the sale of rights to subscribe and from the sale of warrants and that in the inventory of the main trust there are certain stock dividends, including fractional shares and script, some declared out of current earnings and some as a redistribution of capital. The court is then asked to determine whether such cash and the stock dividends, fractional shares and script declared out of current earnings are principal or

income. Nothing is said in the prayer as to the stock dividends which constituted a redistribution of capital. The answer of the trustee admits these allegations of the bill and joins in the prayer including a prayer for instructions as to the status of the stock dividends, fractional shares, and script which were a redistribution of capital.

This court in *Thatcher* v. *Thatcher*, 117 Me., 331, 104 A., 515, clearly laid down the general rule applicable to stock dividends. The opinion given in that case may contain the answers to all the inquiries addressed to us. But counsel for the Girard Trust Company urge upon us that the court in the Thatcher case was laying down the rule which should apply "under all ordinary circumstances" and that there may be here circumstances calling for the application of a different doctrine. They argue that a dividend might be in form a stock dividend but in reality a payment with all the incidents of cash and intended by the corporation as such. What, they ask, shall the trustee do under these circumstances? Furthermore, they admit that whether there should be an exception to the general rule depends, not only on whether the dividend is paid out of accumulated earnings, but also on whether those earnings had accumulated prior or "subsequent to the creation of the trust or the acquisition of shares by the trustee." Restatement, Trusts (1935), Sec. 236.

There is not a single fact set forth in the record to indicate whether any of the cash or dividends held by the trustee come within any of the exceptions to the rule of the Thatcher case suggested by the trustee. The trustee poses for us certain supposititious problems and asks us for instructions what to do in those cases. We see no reason why we should be called on to reassert the general rule already laid down by this court, nor should we be called on to enunciate any qualification of it without knowing that to do so will solve some actual and immediate problem of the trustee.

The trustee may at any time bring a bill setting forth specifically and in necessary detail the facts which give rise to the request for instructions. Until that procedure is followed we must decline to answer the questions propounded. The universal practice in such a case is well stated in *Equitable Trust Co.* v. *Pyle* (Del. Ch. 1938), 2 A. (2d), 81. The court, to use its own language, page 83, declined "to assume a state of facts not shown to exist and then proceed to express an opinion thereon."

This brings us to the prayers for the construction of the will. These should be divided into two classes. In the first one are those wherein the plaintiffs ask as to the meaning of the language in the eighteenth and twenty-fourth clauses of the will giving to them the power to dispose of the corpus of the trusts. In the second are those wherein this court is asked to decide what will happen in various contingencies on the death of a life tenant. We shall consider the second group first.

In the first place, the plaintiffs desire to know the meaning of the phrase in the eighteenth clause of the will "if any of my daughters die intestate and without issue the special trusts created in her favor shall revert to my estate," and particularly if that contingency arises whether the principal of each trust becomes intestate property of John J. Emery.

Secondly, they wish to be informed as to the meaning of the word "equally" as used in the twenty-fourth clause, their desire being to find out how the principal of a trust set-up for a daughter will go if a daughter should die intestate.

Thirdly, they desire to know the meaning of the word "issue" under the eighteenth clause of the will, and particularly whether, if a daughter should die intestate with issue, the issue would take the entire principal of the trust.

Fourthly, they want this court to tell them the nature and extent and interest of the executors and administrators of a daughter in a trust, if a daughter should die without exercising the power of appointment given to her under either the eighteenth or the twenty-fourth clause of the will.

Fifthly, they want to know whether under the eighteenth clause of the will a husband of a daughter would take any part of the trust fund of the daughter if the daughter should die intestate leaving issue.

Sixthly, they ask whether if a daughter dies leaving a will but without exercising the powers granted her under the eighteenth or twenty-fourth clauses of the will of the testator she dies intestate as that word is used in those provisions. In other words, they want to be informed whether the word "intestate" as there used refers to a failure to exercise the power or whether it means dying without leaving a will.

In these prayers and certain additional general ones the plaintiffs are asking this court to determine what will happen at the termination of the life estates set up for a daughter, if the daughter fails to exercise the powers of appointment given her under the will. One event is certain but remote; the other may never happen at all.

With a unanimity seldom found elsewhere in the law, courts have consistently refused during the existence of a particular estate to construe wills in order to determine future rights, and it makes no difference whether the event which may give rise to a future controversy is certain to happen, as the death of a life tenant, or depends on a state of facts which is contingent and uncertain. *Huston* v. *Dodge*, 111 Me., 246, 88 A., 888; *Connolly* v. *Leonard*, 114 Me., 29, 95 A., 269; *McCarthy* v. *McCarthy*, 121 Me., 398, 117 A., 313; *Minot* v. *Taylor*, 129 Mass., 160; *Coghlan* v. *Dana*, 173 Mass., 421, 53 N. E., 890; *Hall* v. *Cogswell*, 183 Mass., 521, 67 N. E., 644; *Wheaton* v. *Batcheller*, 211 Mass., 223, 97 N. E., 924; *May* v. *May*, 167 U. S., 310, 323, 17 S. Ct., 824; *Walker* v. *First Trust & Savings Bank*, 12 F. (2d), 896; *Cowles* v. *Cowles*, 56 Conn., 240, 13 A., 414; *Eaton* v. *Eaton*, 88 Conn., 269, 91 A., 191; *Bridgeport Trust Co.* v. *Bartholomew*, 90 Conn., 517, 97 A., 758; *Brinn* v. *Brinn*, 213 N. C., 282, 195 S. E., 793; *Strawn* v. *Trustees of the Jacksonville Female Academy*, 240 Ill., 111, 88 N. E., 460; *Gafney* v. *Kenison*, 64 N. H., 354, 10 A., 706; *Goddard* v. *Brown*, 12 R. I., 31; *In Re Berlin's Estate*, 6 N. Y. S. (2d), 1005; *Archambault's Estate*, 232 Pa., 344, 81 A., 314; *Straus's Estate*, 307 Pa., 454, 161 A., 547; *Warren's Estate*, 320 Pa., 112, 182 A., 396; *Quigley's Estate*, 329 Pa., 281, 198 A., 85; *Morse* v. *Lyman*, 64 Vt., 167, 24 A., 763; Gardner on Wills, 356-357; Page on Wills (2d), Sec. 1402; Pomeroy Eq. Jur. (4 ed.), Sec. 1157.

A glance at these cases will indicate the reluctance of courts to construe a will in order to decide any question which does not relate to some certain and immediate problem facing either a beneficiary or a fiduciary of an estate.

In *Huston* v. *Dodge*, supra, the court was asked by the trustees of the residue of an estate to construe certain clauses of a will. The court refused to answer those questions which related to matters which were contingent. One of these concerned the disposition of a farm which the testator left to his nephew for life with remainder to

his nephew's son, Isaac, with a proviso that if Isaac should die before his father, the remainder should go to the then living children of the father. The court was asked to decide where the remainder would go in case Isaac and all the other children should die before the father. The court held that the trustees had no present interest in the question and would have none at all unless the remainder should at some future time fall into the residue. The court laid down the general principle in the following language, page 248: "The fact that the question may arise sometime in the future is ordinarily not enough. Such a question should not be decided until the anticipated contingency arises, or at least until it is about to arise, until it is imminent. Then if the trustee needs present advice to know how to meet the contingency, it will be given to him. Then the parties interested in the issue can be heard under the conditions and circumstances as they may exist at that time. They should not be prejudiced. Nor should there be any judgment until there is occasion for it."

The other two cases from our own court are to the same effect.

In *Strawn* v. *Trustees of Jacksonville Female Academy*, supra, the court said, page 118: "Courts of equity will never entertain a suit to give a construction to or declare the rights of parties upon a state of facts which has not yet arisen, nor upon a matter which is future, contingent and uncertain."

In *Minot* v. *Taylor*, supra, a trustee under a will brought a bill for instructions. The question was whether a remainder after a life estate was void for remoteness. The court held that the trustee could not properly ask for instructions until the death of the life tenant. Referring to the question asked, the court said, page 164: "It may involve the rights of persons not now in being, and does not affect the present duty of the trustees."

In *Warren's Estate*, supra, the court held that when life estates were validly appointed it would not pass on the validity of the remainders before the termination of the life estates. It is interesting to note that the Girard Trust Company, one of the present defendants, was a party in this case.

Counsel do not cite in their voluminous briefs any of the above cases. That the question was in mind, however, is evident for in complainants' brief there is an argument which seeks to justify the appeal to the court to settle these many contingent problems.

In the first place it is argued that the statute giving to the court the power to construe wills should be given a liberal interpretation. Conceding this to be true, it does not justify this court in ignoring well-settled principles established by courts generally and particularly by our own court. None of the cases cited by counsel would warrant this court in acceding to their requests. In each of the Maine cases cited, *Baldwin* v. *Bean*, 59 Me., 481 ; *Haseltine* v. *Shepherd*, 99 Me., 495, 59 A., 1025, and *Richardson* v. *Richardson*, 80 Me., 585, 16 A., 250, the problem was one of immediate concern to the parties before the court.

In the second place the amendment to the bill in equity alleges that it is necessary, in order for the plaintiffs to determine whether or not they should exercise the powers of appointment granted to each under the eighteenth and twenty-fourth clauses of the will, to know to whom the property would go if they should fail to exercise such powers. But this court is not called on to decide in advance every future question which may arise under a will merely because to do so may be helpful to a beneficiary or other interested party in determining a present course of conduct. That is the province of counsel. Furthermore either a duty is imposed on each daughter to exercise the powers granted, or if not, a privilege is certainly given to each to direct the ultimate disposition of the principal of the trusts ; and it may well be a question whether this court is called on to construe a will and to give advice on the assumption that that duty will not be carried out or that that right will not be exercised.

We therefore must refuse to construe those portions of the will which provide for the disposition of these trusts in case the plaintiffs should fail to exercise the powers of appointment. The other prayers of the plaintiffs are of a different nature. We are asked as to the extent of the authority given to the daughters under the eighteenth and twenty-fourth clauses of the will to dispose of the principal of the trusts. In order that they may properly exercise these powers they are entitled to an answer to these prayers. Particularly they ask whether the powers are general or special, and if special whether they are exclusive or non-exclusive.

Though the will of the testator is inartificially drawn, his purpose is clear to set up for each daughter certain trusts under the terms of which each beneficiary would ultimately be entitled to the income of

her share for life. Likewise it is clear that he gave to each the power within certain limits to direct by will how the principal of her share should go. In attempting to determine the scope of this right, we must bear in mind that the donee of a power of appointment does not hold title to the property which is subject to the power, but merely acts for the donor in the disposition of it. In the ordinary case, therefore, the property is regarded as passing from the donor of the power to the person appointed by the donee to receive it. *Hogarth-Swann* v. *Weed*, 274 Mass., 125, 174 N. E., 314.

Powers of appointment may be roughly divided into two classes, general and special, and the special into two groups, exclusive and non-exclusive. If the donee of the power may appoint to anyone including himself the power is general, if only to a class the power is special. If the special power permits the donee to bar one or more members of the class from receiving a portion of the property it is exclusive; if every member of the class is entitled to some portion, the power is said to be non-exclusive.

Each of the daughters of John J. Emery, the testator, is empowered by her will to dispose of the principal of the trusts set up for her benefit, provided the property is given to his "descendants." Counsel for the plaintiffs do not contend that these powers are general. They do argue, however, that a daughter being within the designated class, has a right to appoint to her own estate; and secondly they claim that the powers are exclusive.

There can be no doubt what the testator means by "my descendants." He used these words in their ordinary sense to denote his issue however remote. It is apparent from his will that he contemplated that his property would be used for many years for the comfort and enjoyment of those of his own blood. It is true that he gave to the sons their shares outright; but he postponed the final distribution to them until they became of mature years. Though his daughters were very young when he drew his will and when he died, he knew that the time would come when they would marry and there was always present in his mind the fear that their husbands might obtain control of the property which he desired them to have. He accordingly left their shares in trust, and even imposed the duty on the trustee to prevent in so far as possible any husband from obtaining even the income. He was much more alert in foreseeing the problems which

would beset his children than he was skilful in providing for their solution. But the general intent which he had in mind is clear, and to hold that a daughter has the power to appoint by will to her own estate would give to her a control over her share which it was the obvious purpose of the testator to prevent. For an analogous case see *Abbott* v. *Danforth*, 135 Me., 172, 192 A., 544, in which this court gave effect to the testator's true intent in preference to adhering slavishly to a mere formalism. We therefore hold that a daughter does not have the right to appoint to her own estate.

Are the powers of appointment exclusive?

Courts seem to be in great confusion in determining whether powers are exclusive or non-exclusive. This is in part due to certain incidents of non-exclusive powers which have a very direct relation to the case now before us. If the appointment to be valid must include all members of the class, a question immediately arises, in what proportions must they share? At law any share however nominal was sufficient. But it was recognized that for all practical purposes there would be no such thing as a non-exclusive power if the donee could by the allotment of a purely nominal amount such as $1.00 satisfy the requirement that all members of the class must be included. Equity, therefore, intervened and held that the share given to every member of the class must be substantial and not illusory. Thus was developed the doctrine of illusory appointments. For a discussion of this subject see *Kemp* v. *Kemp*, 5 Ves. Jr., 849. The common-law rule had the advantage of being certain; the equitable doctrine raised many problems. These are well stated by Sir William Grant, the Master of the Rolls, in *Butcher* v. *Butcher*, 9 Ves. Jr., 382, 391-393: "It is impossible to have considered a case of this kind with a view to its decision, without wishing, that Judges in Equity had either never assumed control over the execution of discretionary powers; or had laid down rules, by which their successors might be guided in the exercise of that jurisdiction. To say, that under such a power an illusory share must not be given, or, that a substantial share must be given, is rather to raise a question than to establish a rule. What is an illusory share, and what is a substantial share? Is it to be judged of upon a mere statement of the sum given, without reference to the amount of the fortune, which is the subject of the power? If so, what is the sum, that must be given, to exclude the interference of the

Court? What is the limit of amount, at which it ceases to be illusory, and begins to be substantial? If it is to be considered with reference to the amount of the fortune, what is the proportion, either of the whole, or of the share, that would belong to each upon an equal division?" Most serious of all is that there is no rule to guide the donee of the power, who must, at the risk of having the whole appointment fail, determine in advance what the court is going to decide are the limits of the discretion given to him. The dissatisfaction became so acute that the whole doctrine of illusory appointments was abolished in England by statute and courts were left where they were before equity intervened. Lord St. Leonards Act, 1 Wm. IV, Chap. 46. It is interesting to note that this act bears the name of the author of the most authoritative text-book on this subject. In this country some courts have adopted the doctrine of illusory appointments. *Barrett's Ex'r v. Barrett*, 166 Ky., 411, 179 S. W., 396; *New v. Potts*, 55 Ga., 420; *Herrick v. Fowler*, 108 Tenn., 410, 67 S. W., 861; and see *Melvin v. Melvin*, 6 Md., 541, 550; *Portsmouth v. Shackford*, 46 N. H., 423, 427; *McCamant v. Nuckolls*, 85 Va., 331, 338, 12 S. E., 160. Other courts have refused to accept it. *Hawthorn v. Ulrich*, 207 Ill., 430, 69 N. E., 885; *Lloyd v. Fretz*, 235 Pa., 538, 84 A., 450. And see *Lines v. Darden*, 5 Fla., 51; *Fronty v. Godard*, 1 Bail Eq., 517, 530 (S. C., 1833). See cases collected in note L. R. A., 1916, d 498. In *Ingraham v. Meade*, 3 Wall., Jr., 32, the court said, page 40: "However much the chancellor may laud his great principle that equality is equity; how does he know that even extreme inequality was not the very purpose and object of the power." In the instant case, if we should hold the powers non-exclusive, all of these difficulties would be accentuated because the class designated may well be a large one before the power granted to a donee can become operative.

Strangely enough the inclination of courts has been in cases of doubt to construe powers as non-exclusive. *Kemp v. Kemp*, supra; *Alexander v. Alexander*, 2 Ves. Sr., 640; *Hawthorn v. Ulrich*, supra; *Degman v. Degman*, 98 Ky., 717, 34 S. W., 523; *Faloon v. Flannery*, 74 Minn., 38, 76 N. W., 954; *Melvin v. Melvin*, supra; *Varrell v. Wendell*, 20 N. H., 431; *Cameron v. Crowley*, 72 N. J., Eq., 681, 65 A., 875; *McKonkey's Appeal*, 13 Pa., 253; *Cathey v. Cathey*, 28 Tenn., 468. In all but two of these border line cases the

class was a limited one confined to children or grandchildren, immediate objects of a testator's regard, and there is accordingly some reason for holding that it was the intent of the testator that all should share. It is also important to note that in one other, *Hawthorn* v. *Ulrich*, the court though holding the power non-exclusive, refused to apply the doctrine of illusory appointments.

On the tendency to construe powers as non-exclusive the court in *Barrett's Ex'r* v. *Barrett*, supra, page 415, makes the following pertinent observation: "It seems to us . . . , that a careful review of the English authorities will produce the conviction that the mischief arose, not from any fault of the illusory appointment doctrine, or of the rules establishing the distinction between powers exclusive and non-exclusive, but rather because of a too liberal construction of certain powers of appointment as non-exclusive, when in point of fact the evident intention of the testator was to grant an exclusive power."

*In re Veale's Trusts*, 4 Chap., Div. 61 (affirmed 5 Chap., Div. 622), is peculiarly applicable to the situation before us. A testatrix bequeathed a fund to her daughter for life and after her death "to and amongst my other children or their issue, in such parts, shares, and proportions, manner and form, as my said daughter Mary Elizabeth Veale shall by deed or will direct, limit, and appoint. . . ." It was held that the power was exclusive. Jessel, M. R., one of the greatest equity judges, points out the almost insuperable difficulties if the donee of a power of appointment must include every member of an indefinite class such as issue or descendants who may be living at the death of the donee; and then he argues that a power is exclusive "when the objects of it are not readily ascertainable, or, as in this case, cannot possibly be ascertained."

On this general subject see Restatement, Property (1940), Sec. 360.

The guiding principle of a court in construing a will is to determine the intent of the testator, which must be found from the particular language which he has used read in connection with the will taken as a whole and in cases of doubt in the light of the surrounding circumstances. There is no particular magic in isolated phrases. Language which may mean one thing when applied to one state of facts may have to be interpreted differently when applied to an-

other. Precedents are of less importance than elsewhere in the law; and to quite an extent each case must be considered by itself. As Judge Powers has well said in *Bradbury* v. *Jackson*, 97 Me., 449, 456, 54 A., 1068, 1070: "No two testators are situated precisely the same, and it is both unsafe and unjust to interpret the will of one man by the dubious light afforded by the will of another." These principles are fully discussed in *Abbott* v. *Danforth*, supra. See also *In re Veale's Trusts*, supra, 65.

As we read the will of this testator and consider something of his family, his environment, and his manner of life, we learn much more than the mere words tell. We sense both high hopes and deep forebodings, and withal a spirit of justice tempered with affection for a family whom he knew he would probably leave when they were very young. From such an approach, it is not difficult to determine what he desired when he gave to his daughters the right by will to dispose of the principal of these trusts to his descendants.

There is a difference in the language used in the eighteenth and twenty-fourth clauses conferring the power on the daughters. This does not, however, appear to have any particular significance. In the eighteenth clause the power is given to dispose of the principal by will, "provided it be bequeathed to my descendants." In the twenty-fourth clause it is provided that "the principal shall pass to my descendants only, and in the manner, in equal or unequal shares, and at the time prescribed in the wills of each one." Nor in the view we take of the will is the phrase "in equal or unequal shares" conclusive as indicating that he intended every descendant to take a part.

When the testator drew his will he was a man sixty-seven years old, wealthy, experienced, and confident of his own judgment. He had married a young wife who was then but twenty-seven and they had four children. His oldest daughter was eight, his youngest hardly more than a year old, and one child was not born. He knew well the dangers to which this family would be subject in dealing with a very large estate. But he wished them to have it. Substantially all of it he left in trust. Relatively small amounts were to be given to the sons at various times, but when the youngest son should reach forty they were to have their shares outright. In the case of both the sons and the daughters, however, the greater part of the income was

to accumulate until the time set for distribution to the sons. Had this provision not been modified by the decree of this court entered in 1923, the estate now would amount to far more than the $13,000,000.00 involved in the litigation before us. His will indicates clearly that he had the same feeling of affection for all his children and wished to treat them and all children subsequently born in exactly the same way. That purpose appears by implication throughout the will and is expressly stated in the twenty-sixth clause. "It is my intention," he says, "that all my children shall share equally in my estate." He was determined in so far as he could accomplish it, however, that his property should pass from his children to his children's children and so on. He was apparently willing to trust his sons when they should reach mature years to handle their own shares. In the case of his daughters, he feared the influence of their husbands; and therefore they were to have no control over the principal. He did not, however, wish to deprive them of the right which the sons had to direct the disposition of it by will but he restricted their power so that they could only give their shares to his descendants. What he may have expected of his sons, he required of his daughters. Subject to that limitation it is apparent that sons and daughters were on the same footing. As he drew his will, he realized that the ultimate distribution from his children might not take place for seventy-five years or even longer, and he wisely did not attempt to control this right of disposal, except in so far as he imposed the restriction on the power of his daughters. Knowing that the power of a daughter could only be exercised by will, it surely was not his purpose to require her to disperse her share among what might be at the time of her death a very large group, some of whom she might neither care about nor even know. It was not the father's intent to so restrict a daughter's power that she could not appoint her share to her issue if she wished. The meticulous care which the testator took to set apart a separate share for each child and to provide that in case of the death of a child "prior to the falling in of any trust . . . the issue of such child shall share in such distribution," is utterly inconsistent with the claim of counsel for the sons that the power of appointment is non-exclusive. If the power is non-exclusive and the doctrine of illusory appointments applies, consider the situation when the first daughter dies. If she

exercises the power given her, she must by will give a substantial amount to each surviving brother and sister and to each of their issue, for they are all descendants and would be members of the class. Under such a construction the interest of her own children would be dissipated to favor those who already have their own portions. It would be hard to imagine a more inequitable result nor one which was farther from the expressed and implied purpose of the testator. If he had intended to bind the daughters by such a rigid rule, he could just as well have settled himself how the remainder would go after the death of a life tenant. That he did not do so shows that he trusted to the unfettered judgment of the daughters to dispose of the principal of the trusts to his descendants in the light of events which he could not anticipate. His thoughts were apparently in accord with those of Lord Mansfield who in his will summed up his purpose as follows: "Those who are dearest and nearest to me best know how to manage and improve, and ultimately in their turn to divide and subdivide, the good things of this world which I commit to their care, according to events and contingencies which it is impossible for me to foresee, or trace through all the mazy labyrinths of time and chance."

We therefore hold that under the eighteenth and twenty-fourth clauses of the will of John J. Emery each of his daughters has a power to appoint to the descendants of the testator the principal of the trusts set up for her benefit and that such power is exclusive in the sense that she has the right to limit the distribution to such member or members of the class as she may see fit.

*Case remanded to the sitting justice for a decree in accordance with this opinion; reasonable counsel fees and fees for guardian* ad litem *to be charged against the various trusts to be fixed by him in accordance with the interest of the respective parties in the issues properly presented to this court.*

BARNES, C. J., having retired, did not join in this opinion.